*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

In re R. J. FISCHER, Minor.

UNPUBLISHED
January 15, 2019

Nos. 344042; 344047
Wayne Circuit Court
Family Division
LC No.  14-517588-NA

Before:  LETICA, P.J., and CAVANAGH and METER, JJ.

PER CURIAM.

In these consolidated appeals, respondent-mother, Y. Fischer, and respondent-father, S. Fischer, appeal as of right the trial court's order terminating their parental rights to the minor child pursuant to MCL 712A.19b(3)(c)(*i*) and (g).  We affirm.

Respondents were married on June 21, 2014.  Their daughter was born less than two months later.  Shortly after the child's birth, Child Protective Services (CPS) received a referral regarding allegations of abuse and neglect.  During a visit to the family home on August 13, 2014, a CPS investigator discovered that the child was living in deplorable conditions.  Respondents' home was cluttered, unkempt, and flea-infested.  Dirty dishes were strewn about and the home smelled of cat urine.  Both respondents had prior CPS histories.[1]  On August 29,

---

[1] In 2009, respondent-mother's oldest daughter, AS, was removed from her care because of allegations of abuse and neglect.  Respondent-mother was offered services but was unable to benefit from the treatment plan.  Consequently, a permanent custody petition was filed.  During the proceedings, respondent-mother voluntarily relinquished her parental rights to AS in May 2011, and the court terminated her parental rights in June 2011.  Thereafter, AS was adopted by maternal grandmother Steggel.

Respondent-father also had a significant CPS history before the child's birth.  Respondent-father is several years older than respondent-mother and he has fathered six children.  He did not have a relationship with several of these children.  In 2004, respondent-father was convicted of physically assaulting a stepdaughter, and he was sentenced to probation

2014, the child was removed from respondents' care and placed with her maternal grandmother, S. Steggel. Because Steggel had adopted respondent-mother's oldest daughter, AS, in 2012, the child was now also living with her half-sister. Respondents' unsuitable housing and their significant prior CPS history compelled petitioner to file a permanent custody petition on August 29, 2014.

After the court took jurisdiction of the minor child, respondents were offered services for more than three years. During this time, the court considered, but denied, two permanent custody petitions. After the denial of the second petition in November 2017, the court ordered, in February 2018, that the child be returned to respondents' care with in-home reunification services in place. Only a short time later, however, petitioner learned that respondents were homeless and unemployed, and they had been deceiving petitioner regarding their circumstances. Consequently, on March 5, 2018, petitioner filed a supplemental petition, once again seeking termination of respondents' parental rights. Following a hearing in April 2018, the trial court found clear and convincing evidence to support termination of respondents' parental rights pursuant to MCL 712A.19b(3)(c)(*i*) and (g). The court also found that termination of respondents' parental rights was in the child's best interests. The court noted that the child had been in care for 3½ years and, during this period, despite being offered a multitude of services respondents had failed to achieve the stability necessary to safely raise a child. These appeals followed.

Both respondents argue that the trial court clearly erred by finding that there was clear and convincing evidence to support termination of their parental rights pursuant to MCL 712A.19b(3)(c)(*i*) and (g). We disagree.

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000), superseded by statute on other grounds as stated in *In re Moss*, 301 Mich App 76, 83; 836 NW2d 182 (2013). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

for one year. In addition to the criminal matter, a related CPS investigation ensued and respondent-father participated in a court-ordered treatment plan. Eventually, he was permitted to return to the family home. In December 2005, however, respondent-father was found to have violated his probation when a witness observed him strike another stepchild. The court then sentenced respondent-father in 2006 to one to two years' incarceration for this probation violation. While these criminal matters were pending, respondent-father's one-year-old son tragically died on September 14, 2005, while in respondent-father's care. The autopsy report concluded that the child died of position asphyxia by entrapment and noted that "[a]ccording to the results of the investigation, the child was left unattended in his high chair for a long period of time prior to his being found unresponsive."

The trial court terminated respondents' parental rights pursuant to MCL 712A.19b(3)(c)(*i*) and (g), which, at the time the trial court entered its order, permitted termination of parental rights under the following circumstances:

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[2]

After reviewing the record, we conclude that the trial court did not err when it terminated respondents' parental rights under the foregoing grounds.

The child came into care because respondents lacked suitable housing and income and because of their significant prior CPS history. Respondents were ordered to comply with a treatment plan that included participating in parenting classes, individual therapy, psychological and psychiatric evaluations, and parenting time. Respondents were also ordered to obtain and maintain suitable housing and a legal source of income. Respondents were allowed more than 3½ years to participate in a treatment plan and work toward reunification. Indeed, considering that they both were involved in prior CPS matters during which time they also participated in court-ordered services, respondents have been offered assistance for well more than 3½ years. Despite all of the services provided to respondents, it is clear that they never benefited from the assistance. Respondents never demonstrated that they could maintain the consistency and stability necessary to parent a child. Indeed, virtually every time respondents approached the possibility of reunification, another matter would arise that would prevent the child from being returned to their care. Unstable housing was the persistent theme throughout the case. Respondents lost an apartment after respondent-father was terminated from his employment as a

---

[2] MCL 712A.19b(3)(g) was amended by 2018 PA 58, effective June 12, 2018. As amended, § 19b(3)(g) now provides:

The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

maintenance man for the complex. When they moved in with the paternal grandmother, there were periods that the home was unsuitable for the child because a convicted pedophile also lived in the home and there was a flea infestation at one time. However, this was not the only impediment. Respondent-father's lack of motivation to address his absconder status and outstanding warrant remained a barrier to reunification for several months. Then, respondent-father's substance abuse issues further impeded their progress. Ultimately, it appears that respondents were simply unmotivated and unwilling to achieve the stability necessary to provide for their daughter's care and custody.

At the time of the termination hearing, respondents did not have stable housing, transportation, or sufficient income to provide for their child. Respondents challenge this conclusion and point to the fact that in April 2018 they were living in a suitable home and looking for employment. However, it is clear that respondents were wholly dependent on the generosity of an extended relative, a pattern they had assumed very early in the proceedings. When individuals solely rely on others and refuse to be self-sufficient, there lurks in the background the very real possibility the bounty provided by others will abruptly end. This eventually occurred. In any event, a semblance of stability provided by others does not truly evidence respondents' ability to independently provide for their child.

Thus, while on first blush, the housing provided by the paternal cousin at the 11th hour appeared promising, it was really no more stable than any other housing situation respondents had found themselves in during the three years the child had been in care. Indeed, only a few weeks earlier, when the child was returned to their care, respondents represented that housing with the paternal grandmother was stable and appropriate. Yet only five days into that arrangement, the paternal grandmother evicted respondents, which is how they ended up in the home of a paternal cousin. While the paternal cousin suggested that she was willing to enter into a two-year lease, no lease had been executed at the time of the termination hearing. Respondents had no legal rights to the housing. Thus, the court correctly determined that respondents lacked suitable and stable housing after 3½ years of services.

Similarly, it was clear that transportation was going to be an issue because the paternal cousin's home was somewhat remote. Again, the paternal cousin represented that her car would be available for respondents' use and that she was in the process of buying respondents a car. This, again, was insufficient for the court to conclude that respondents had reliable transportation to meet the child's needs. Indeed, respondents had already missed the child's speech therapy because of a lack of transportation. Respondents also lacked sufficient income to care for their daughter. At the time of the April 2018 hearing, respondent-father was unemployed and respondent-mother had only secured a job at a deli two weeks earlier. Ultimately, it was quite apparent at the time of termination that respondents could not independently provide proper care and custody of their child. They were completely dependent upon the financial support of extended family.

Further, there was clear and convincing evidence that the conditions would not be rectified within a reasonable time considering the child's young age. Despite being offered a treatment plan, years of services, and additional time to work toward reunification (the court considered and denied two prior permanent custody petitions), at the end of the day respondents could not demonstrate any stability or consistency. Further, it appears that respondents were

simply unmotivated, as opposed to unable, to take the necessary steps to create a more stable and secure home for their child. When the child was removed from respondents' care as a newborn infant, the court asked respondent-father why his home was in such a deplorable condition. Respondent-father candidly replied, "We were just being lazy. I have no excuse. We were just being lazy." When respondent-father's absconder status was a barrier to reunification, his therapist noted that respondent-father appeared unmotivated to resolve the matter. Then, respondent-mother was unmotivated for three years to even consider planning separately from respondent-father. Both respondents underwent a clinic evaluation, a psychological evaluation, and a psychiatric evaluation. None of the reports note any mental health or intellectual factor that would have contributed to their inability to provide for their child. The only reasonable conclusion, borne out by the evidence, was that respondents were simply unmotivated and unwilling to provide for their child. Thus, even if respondents were granted, yet again, additional time to remove the barriers to reunification, it is unlikely that the conditions would be rectified within a reasonable time considering the child's age.

In sum, the evidence clearly established that although respondents had been given 3½ years to work on their treatment plan, they still had not overcome the barriers to reunification. Moreover, based on their history, there was no indication that they would be able to do so within a reasonable time considering the child's young age and the length of time she had been in care. The child had waited her entire young life for respondents to provide her with a safe and stable environment. Based on the evidence, there was no reasonable likelihood that any additional time to comply with services would have yielded a different result. Accordingly, the trial court did not clearly err when it terminated respondents' parental rights pursuant to MCL 712A.19b(3)(c)(*i*) and (g).

Next, respondents challenge the trial court's finding that termination of their parental rights was in the child's best interests. Again, we find no error in the trial court's ruling. Once a statutory ground for termination has been established, the trial court must find that termination of parental rights is in the child's best interests before it can terminate parental rights. MCL 712A.19b(5); *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Whether termination of parental rights is in the child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in the child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App at 42. The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App at 131.

The trial court did not clearly err when it found that termination of respondents' parental rights was in the child's best interests. At the time of the termination hearing, the child had been in care for 3½ years, indeed, her entire life. Respondents were offered years of services, and more than ample time to work toward reunification. They failed to benefit from the services offered and squandered the opportunities provided to them. Neither respondent demonstrated the

stability necessary to parent the child. Further, respondents' lack of stability was taking its toll on the child. When the child was briefly returned to respondents in February 2018, the disruption in her schedule caused the child to experience nightmares and sleeping issues. Both respondents argue that a bond existed between them and their child. But while a bond existed, this factor does not outweigh the child's need for a safe and stable home.

By contrast to the home respondents would have provided for the child, the maternal grandmother was providing a stable and nurturing home that the child required. Indeed, having been placed with the maternal grandmother at only a few weeks of age, this was the only home the child had known and she was bonded to her grandmother. Moreover, because the grandmother had adopted respondent-mother's oldest daughter, the child was provided the opportunity to live with her biological sister and foster the sibling bond.

Respondents argue that termination of their parental rights was not appropriate considering that the child was placed with their maternal grandmother. They further contend that the trial court should have considered a guardianship in lieu of terminating their parental rights. Although placement with a relative weighs against termination, and the fact that a child is living with relatives must be considered, a trial court may terminate parental rights in lieu of placement with a relative if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. Similarly, a trial court is not required to establish a guardianship if it is not in the child's best interests to do so. *In re Mason*, 486 Mich 142, 168-169; 782 NW2d 747 (2010). In this case, the child was still very young, only 3½ years old at the time of the termination hearing. The maternal grandmother had expressed a desire to adopt the child. The foster care worker explained, and the trial court agreed, that guardianship was not a viable option because it would not provide the permanency and finality that the child required. Based on this finding, the trial court did not err by declining to implement a guardianship. Termination of parental rights, which would pave the way for adoption, was a preferable permanency path for the child. Under these circumstances, the trial court did not clearly err when it rejected guardianship and determined that termination of respondents' parental rights was in the child's best interests.

In an effort to avoid the foregoing conclusion, respondent-mother argues that she was denied due process because the trial court employed a "blanket policy" that guardianship would not be considered for very young children. Recently, our Supreme Court considered, in an order of remand, the implications of a trial court's blanket guardianship policies. In *In re Timon*, 501 Mich 867; 901 NW2d 398 (2017), the Court remanded the case to the trial court for reconsideration of whether termination was in that child's best interests. In doing so, the Court stated that "[t]he trial court judge failed to articulate whether her generalized concerns regarding the lack of permanency and stability for younger children placed with a guardian are present for *this child*." *Id*. The Court further instructed that "the trial court shall make an individualized determination as to whether terminating respondent's parental rights is in the best interest of respondent's youngest child without regard to a generalized policy disfavoring guardianship for children under the age of 14." *Id*. From this language, we discern that a trial court, when considering the best interests of a child, must refrain from implementing a blanket policy and, instead, must make an individualized determination of the child's best interests.

In this case, we first note that respondent-mother has provided no support for the proposition that the trial court here employed a blanket policy. In any event, unlike the

circumstances in *In re Timon*, the record reflects that the trial court considered the problems associated with a guardianship in *this* case. Not only did the court consider the child's young age, and her need for permanency, but it also evaluated the probability that respondents would be in a position to parent the child within a reasonable time. The court contemplated the individual circumstances with this family by balancing the needs of the child with the possibility that the parents might someday be in a position to care for the child. When doing so, the court considered that a guardianship in this case would extend over several years, perhaps to the child's 18th birthday. The court noted that it would not be fair to the child to have her situation "up in the air" that long. It also noted that the child was entitled to the security of knowing where she was going to live, what school she would go to, and who her permanent caretaker would be. These considerations were particularly sensitive because if the child were placed in a simple guardianship with her grandmother, she would be potentially confused or confounded by the fact that her sister had been adopted by their grandmother. Only after the court considered several factors individual to this child did it conclude that it would be unreasonable for the child to be subject to a mere guardianship when there was a capable relative, indeed, the only caregiver the child had ever known, willing to adopt the child. For these reasons, the trial court did not clearly err by finding that a guardianship with the paternal grandmother was not in the child's best interests.

After having been in care for more than 3½ years, the child was entitled to stability, permanency, and finality in order to foster her continued growth and development. Accordingly, the trial court did not clearly err when it held that termination of respondents' parental rights was in the child's best interests.

Affirmed.

/s/ Anica Letica
/s/ Mark J. Cavanagh
/s/ Patrick M. Meter